(No. 31781.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES RYAN, Plaintiff in Error.

*Opinion filed November 27, 1951—Rehearing denied Jan. 21, 1952.*

488

CRAMPTON, J., dissenting.

RALPH S. MCFARLAND, of Chicago, (G. A. BURESH, and C. VERNON THOMPSON, of counsel,) for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, WILLIAM J. McGAH, JR., and EDMUND H. GRANT, all of Chicago, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A judgment of the criminal court of Cook County found the defendant, James Ryan, guilty of criminal contempt of court and sentenced him to the county jail until such time as he should comply with the order of the court by producing the books and records of Tam O'Shanter Country Club, a corporation, as specifically designated in a *subpoena duces tecum*. The case is here on writ of error.

The July, 1950, grand jury of the criminal court of Cook County was investigating violations of the State's antigambling laws. On July 19, 1950, the State's Attorney filed a verified petition in the criminal court seeking the issuance of a *subpoena duces tecum* requiring the Tam

O'Shanter Country Club, an Illinois corporation, and Wilfred A. Weismann, its secretary, to produce certain books, records and documents alleged to be in their possession and necessary and material to be produced.

An order was entered that the desired *subpoena duces tecum* issue, directed to the club and its secretary, Weismann, commanding each of them to appear forthwith before the grand jury to give evidence in the cause and to produce all papers described. The *subpoena duces tecum* issued the same day contained the name of the defendant, James Ryan, in addition to the parties named in the petition and order. It commanded the corporation, Weismann and defendant to produce the following records before the grand jury:

"(A.) All records showing Cash Receipts of Tam O'Shanter Country Club for period January 5th, 1949, to July 5th, 1950.

"(B.) All records showing Cash Disbursements of Tam O'Shanter Country Club for period January 5th, 1949, to July 5th, 1950.

"(C.) All records showing Cash Receipts received by Tam O'Shanter Country Club for period January 5th, 1949, to July 5th, 1950, from operation of Coin Machines, including slot machines and from Gambling Games.

"(D.) General Ledger of Tam O'Shanter Country Club for period January 5th, 1949, to July 5th, 1950.

"(E.) All records showing Accounts Receivable and Accounts Payable of Tam O'Shanter Country Club for period January 5th, 1949, to July 5th, 1950.

"(F.) All records showing Accounts of Each Member belonging to Tam O'Shanter Country Club for the last three years,

"together with all copies, drafts, and vouchers relating to said documents, and all other documents, letters and paper writings whatsoever, that can or may afford any information or evidence in said matter."

This *subpoena duces tecum* and a grand jury *subpoena ad testificandum* were served upon defendant on the following day. He appeared before the grand jury, answered some questions, refused to answer others on the ground that the answers might tend to incriminate him, but failed to produce the materials demanded by the *subpoena duces tecum*. On August 3, 1950, the foreman of the grand jury filed a verified petition for a rule to show cause why defendant should not be held in contempt for failure to obey the *subpoena duces tecum*. An order directing defendant to show cause was entered on the same day. Defendant filed a sworn answer, and, after a hearing, he was found guilty of contempt and committed by the court to the county jail to remain until such time as he complied with the order by producing the books and records of the Tam O'Shanter Country Club specifically designated in the *subpoena duces tecum*.

To reverse the judgment, defendant first contends that he should be discharged because his sworn answer to the rule to show cause purged him of the alleged contempt. He argues that he was tried for a criminal contempt and therefore was entitled to be tried on his answer alone, that answer being conclusive as to the facts it alleges, and the remedy for false statements in the answer being by prosecution for perjury.

We do not pause to consider either our own decisions indicating that since the grand jury is a constituent part of the court, a contempt committed before it is a direct contempt to which the rule relied upon by defendant is inapplicable, (*People* v. *Sheridan,* 349 Ill. 202; *In re Estate of Kelly,* 365 Ill. 174,) or the decisions of other jurisdictions pointing out the anachronistic character of that rule. (See *Clark* v. *United States,* 289 U.S. 1, and the authorities there cited.) For analysis of defendant's answer shows that even if the rule relied upon was applied here, it would not assist him. It is not just any answer

which purges the witness of contempt, but only an answer which sets forth facts which, as a matter of law, excuse him from responding to the command of the *subpoena*.

Setting apart, for the moment, those portions of the answer in which defendant justifies his position upon constitutional grounds, the answer first points out that the *subpoena* was served upon defendant by a policeman of the city of Chicago at a place outside the city limits. Just what legal consequences of benefit to defendant might be thought to follow from these allegations is not apparent. (See, *Chicago and Aurora Railroad Co. v. Dunning,* 18 Ill. 494.) In any event, defendant's assignment of error that no lawful service of the *subpoena* was had upon him has not been argued and is abandoned.

The answer next alleges that following defendant's failure to appear before the grand jury he was arrested under an irregular writ of attachment and forcibly brought before the grand jury. This arrest occurred prior to the issuance of the rule to show cause which instituted the contempt proceeding now before us. It is manifest that defendant was arrested for his failure to appear as a witness in response to the *subpoena ad testificandum* which had been served upon him. The circumstances of that arrest and its validity or invalidity have no bearing upon the propriety of the order committing defendant for failure to obey the *subpoena duces tecum.*

Defendant's answer next asserts that the petition for the issuance of the *subpoena duces tecum* was insufficient to give the court jurisdiction to order the issuance of the *subpoena.* The defect relied upon is the alleged failure of the petition to state the nature of the matter pending before the grand jury or any other fact indicating that the documents sought were necessary or material to the investigation. To sustain his contention, defendant relies upon section 9 of the Evidence Act (Ill. Rev. Stat. 1951, chap. 51, par. 9,) which provides: "The several courts shall have

power, in any action pending before them, upon motion, and good and sufficient cause shown, and reasonable notice thereof given, to require the parties, or either of them, to produce books or writings in their possession or power which contain evidence pertinent to the issue." It is true that in *Bentley* v. *People,* 104 Ill. App. 353, the Appellate Court, placing reliance upon this statute, held that a *subpoena duces tecum* to produce books and records before a grand jury should not issue, in the absence of any showing that the books requisitioned contain anything pertinent to any matter undergoing investigation before the grand jury. But the unambiguous language of section 9 discloses that it is not applicable to proceedings before a grand jury. The statute specifically refers to pending actions, issues, reasonable notice and "the parties or either of them." A proceeding before a grand jury is not a pending action but rather a secret investigation which may or may not result in the commencement of a criminal proceeding. The giving of notice of a motion for a *subpoena duces tecum* is unknown in grand jury investigations. There are no parties but only witnesses. There are no issues. Section 9 of the Evidence Act does not apply to grand jury investigations. There is no statutory requirement that the witness subpoenaed be informed as to the nature of the investigation, either in the petition for the *subpoena* or in the order directing its issuance. A witness commanded to produce documents before a grand jury may be entitled, however, to be informed as to the nature of the matter under investigation in order to safeguard his constitutional rights. In this case, the defendant was informed by the original petition, indeed by the *subpoena* itself, that the grand jury was investigating Tam O'Shanter Country Club in connection with gambling and slot machines. That information was adequate to meet any constitutional requirement. In addition, as hereinafter pointed out, the petition of the foreman of the grand jury for a rule to show cause spelled

out in detail the relevance of each of the documents included in the *subpoena*.

Defendant's answer next complains that he was not named in either the petition seeking the *subpoena* or the order directing its issuance and that his name was improperly added to the *subpoena* issued by the clerk of the court. On this ground, he contends that he was not guilty of contumacious conduct in refusing to produce the designated books and records. Defendant was not named in the petition, and the order entered directed that a *subpoena* issue to the Tam O'Shanter Country Club and Weismann, its secretary. Defendant's name, written in longhand, appears in the *subpoena* served upon him. The names of the other witnesses were typed. Defendant's conclusion is that his name was added to the *subpoena* after it was issued by the clerk. But the facts remain that the documents requisitioned were the books and records of the corporation; that the petition filed sought a *subpoena* directed to the corporation; that the order authorized the issuance of a *subpoena* directed to the corporation, and that the corporation was named in the *subpoena* which issued. When the books and records of a corporation are desired to be produced before a grand jury, a *subpoena duces tecum* may be directed to the corporation itself and the corporate officer having their custody is a proper person to produce them. (*Wilson* v. *United States,* 221 U.S. 361; *People* v. *Reynolds,* 350 Ill. 11.) Answering the rule to show cause, defendant denied that he was an officer, director, member or official of the corporation. He admitted, however, that he was attorney in fact of the corporation, and in this capacity had the sole and exclusive possession of the records demanded, and that no other person had access to, or even knowledge of the location of, the documents ordered to be produced. As a corporate agent having possession and control of its records, defendant was amenable to the *subpoena duces tecum* directed to

the corporation. This being so, whether he was named in the petition, order, or *subpoena* is immaterial. Since the *subpoena* was directed to the corporation, defendant was a proper person to be served and the *subpoena,* if otherwise legally sufficient, imposed upon him the duty of obedience to its command.

It is apparent that none of the allegations of defendant's answer thus far discussed justify his refusal to comply with the command of the *subpoena.* The remaining portions of the answer raise constitutional issues—that enforced production of the books and records would deprive the defendant of his privilege against self-incrimination, and would constitute an unreasonable search and seizure.

In analyzing the claim based upon the privilege against self-incrimination, it is most important to note that the books and records sought by the *subpoena* were books and records of the corporation, Tam O'Shanter Country Club, and that it is the defendant who is asserting the privilege against self-incrimination. On these facts, it is quite clear that the privilege against self-incrimination is not an available defense, either under the Illinois constitution or that of the United States. As we stated in *People* v. *Munday,* 280 Ill. 32, "* * * while one cannot be compelled to produce any of his private books or papers which may tend to incriminate him, he cannot refuse to produce the books or papers of a corporation of which he is an officer or in which he may be interested even though they may be in his custody and under his control, as they are not his private books and records but the books and records of the corporation."

The Supreme Court of the United States has so ruled as to the Federal constitution. "Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation. *Hale* v. *Henkel,* 201 U.S. 43; *Wilson* v. *United States,* 221 U.S. 361; *Essgee Co.* v. *United States,*

262 U.S. 151. See, also: *United States* v. *Invader Oil Corp.* 5 F. (2d) 715." (*United States* v. *White*, 322 U.S. 694.) And, because of the personal character of the privilege, the custodian of corporate records cannot claim a privilege against self-incrimination, even though production of the papers might incriminate him. *Wilson* v. *United States,* 221 U.S. 361; *Dreier* v. *United States,* 221 U.S. 394; *Baltimore & Ohio Railroad Co.* v. *Interstate Commerce Com.* 221 U.S. 612; *Wheeler* v. *United States,* 226 U.S. 478; *Grant* v. *United States,* 227 U.S. 74; *Essgee Co.* v. *United States,* 262 U.S. 43.

Concerning defendant's claim that the *subpoena* is so broad as to amount to an unreasonable search and seizure, what was said in *People* v. *Allen, post,* page 508, decided today, is pertinent. Under the authorities there cited, the demand here is not unreasonable in view of the subject under investigation—the conduct of gambling operations by a country club. The petition for a rule to show cause spelled out the materiality of each of the demanded records in the following terms: "* * * that the records showing the cash receipts of the corporation for the period of January 5, 1949 to July 5, 1950 will show the cash receipts obtained by collections from slot machines and other gambling devices for the period mentioned; that the records showing the cash disbursements of the corporation for the period of January 5, 1949 to July 5, 1950 will show to whom the cash receipts obtained from the slot machines and other gambling devices was paid or delivered; that the general ledger of the corporation for the period of January 5, 1949 to July 5, 1950 will further establish the cash receipts of slot mechines and other gambling devices and the disposition of the said receipts; that the accounts receivable and accounts payable of the corporation will establish the record of I.O.U.'s signed by various persons with reference to gambling accounts of the said persons and the purchase, rental and repair

of various gambling devices; that the records of the corporation showing the accounts of each member of the Tam O'Shanter Country Club will establish that members operated various gambling devices on the premises of the Tam O'Shanter Country Club and had charged against their accounts certain sums of money used by the respective members in the operation of gambling devices."

In one particular, however, the question is not ruled by *People* v. *Allen*. The last clause of the *subpoena* reads, "together with all copies, drafts and vouchers relating to said documents, and all other documents, letters and paper writings whatsoever, that can or may afford any information or evidence in said matter." The petition for the issuance of the *subpoena* did not contain this clause, nor did the order directing its issuance. It was a part of the printed form of *subpoena* used. The same clause appeared in the *subpoena* in *People* v. *Allen*, but there the propriety of the various items of the *subpoena* was tested by a motion to quash, and the resulting order of the court enumerated the specific items to be produced.

This general language in the *subpoena*, not requested and not authorized, is clearly surplusage. It neither adds to nor detracts from the *subpoena*. Standing alone, it would not support a contempt citation. There was no challenge directed to this printed portion of the *subpoena* in the trial court. Defendant, however, relies upon the statement in *Bowman Dairy Co.* v. *United States*, 341 U.S. 214: "One should not be held in contempt under a subpoena that is part good and part bad." It is important to note, however, that the offending clause in that case had survived a motion to quash in the trial court. In our opinion the inclusion of an improper item in a *subpoena duces tecum* does not result in total invalidity so that a witness thereby escapes the obligation of complying with any portion of it. Cf. *Tolman* v. *Jones*, 114 Ill. 147; *Ex parte Connor*, 240 Ala. 327, 198 So. 850; *Kimball* v.

*Superior Court,* 38 Cal. App. 761, 177 Pac. 488; *Hanna* v. *State,* 169 Miss. 314, 153 So. 371; *In re Knaup,* 144 Mo. 653, 46 S.W. 151; *Ex parte Tinsley,* 37 Tex. Crim. App. 517, 40 S.W. 306, aff'd 171 U.S. 101; *Liquor Control Com.* v. *McGillis,* 91 Utah, 586, 65 Pac. 2d 1136. See: *New Parkway Vistas, Inc.* v. *Ginsberg,* 258 App. Div. 1089, 18 N.Y.S. 2d. 4.

In affirming the *Tinsley case,* the Supreme Court displayed a different attitude from the one stated in the *Bowman Dairy Co. case.* "We concur in the view that it was undoubtedly competent for the District Court to compel the surrender of the minute book and notes, in Tinsley's possession, and that he could not be discharged on *habeas corpus* until he had performed or offered.to perform so much of the order as it was within the power of the District Court to impose, even though it may have been in some part invalid. *In re Swan,* 150 U.S. 637." (*Tinsley* v. *Anderson,* 171 U.S. 101, 107.) And this court, in *Tolman* v. *Jones,* 114 Ill. 147, adopted an even more stringent viewpoint: "The order of June 16, at the most, was not wholly void, but only in the particular wherein it is complained of as being too broad. Appellant's proper remedy would have been an application to the court to modify the order in that respect. * * * There was no offer or willingness ever expressed to execute any assignment to the extent it is not objected to, as being too broad." See, also: *Berkson* v. *People,* 51 Ill. App. 102, 109, 111.

A witness faced with a *subpoena duces tecum* which he believes to be invalid in whole or in part has the opportunity to appear before the court which issued it and move that it be quashed, vacated, or amended. At that time a speedy adjudication of the validity of the entire *subpoena* may be had. If the witness chooses, instead, to sit by and do nothing but wait for the contempt proceeding in which to litigate these issues, he assumes the risk of punishment for failure to obey the valid portion of the *subpoena.* In

this case, defendant took that risk. Power to punish his disobedience is not lost because he points out, for the first time in this court, a technical objection. A concession that the general language of the last clause of the *subpoena* is bad would not aid defendant. The judgment sentencing him for contempt of court commits him to the county jail until he produces the books and records "specifically designated" in the *subpoena*. Since the last clause of the *subpoena* does not specifically designate any documents, it is clear that defendant was not sentenced for failure to comply with that clause, but only for his failure to produce the books and records which were specifically designated in clauses "A." to "F." inclusive.

Defendant next contends that a sentence to indefinite imprisonment is improper in a criminal contempt proceeding. He relies upon *People* v. *Redlich,* 402 Ill. 270, a civil contempt proceeding, where the following observation, unnecessary to the decision, was made: "Imprisonment imposed for a criminal contempt is purely punitive and must be for a definite term." The only authority cited in support of the quoted statement is *Rothschild & Co.* v. *Steger & Sons Piano Mfg. Co.* 256 Ill. 196, another civil contempt case, which does nothing more than intimate that imprisonment should be for a definite term. Our decisions in this area have been characterized by a flexibility which is not reflected in the single sentence relied upon from *People* v. *Redlich.* In *People* v. *Elbert,* 287 Ill. 458, the court weighed the relative effectiveness of punishment for civil or criminal contempt and then said: "The dividing line between the acts constituting criminal and those constituting civil contempts becomes indistinct in those cases where the two gradually merge into each other. In those cases contempts have been classified and punished by the courts in some jurisdictions as criminal contempts and in others as civil contempts. Some courts adhere to the rule defining them as civil or criminal contempts, according to

the character of the suit in which they occur, designating them as civil contempts if the original suit is a civil suit and as criminal contempts if they arise in an original suit criminal in form. In most cases where they thus rest on the boundary line they are both civil and criminal contempts, and so far as the rights of the contemnors are concerned may be punished as either." In *People ex rel. Brundage* v. *Peters,* 305 Ill. 223, this court said: "There is no difference in the power of the court to administer punishment in the two classes of contempts or in the penalty that may be inflicted. * * * All the authorities agree that the power of courts to adjudge punishment for contempts does not depend on constitutional or legislative grant, but is inherent in all courts as necessary for self-protection and an essential auxiliary to the administration of the law." Commitments of the character here involved were sustained in *Wilson* v. *United States,* 221 U.S. 361, and *Hale* v. *Henkel,* 201 U.S. 43, both involving criminal contempts for failure to produce corporate books and records in grand jury investigations.

In any event, the present defendant, who was sentenced to an indefinite term of imprisonment, is hardly in a position to complain that he was not sentenced to a definite term of imprisonment. As has been aptly observed, he carries the keys of his prison in his own pocket (*In re Nevitt,* 117 Fed. 448, 461,) when sentenced to an indefinite term. He can end the sentence when, as and if he so desires. This he could not do if sentenced to a definite term.

Defendant's last contention is that the judgment order of August 25, 1950, is impossible of performance because it commands him to produce the documents before the July, 1950, grand jury, now nonexistent, in order to obtain his release from confinement. He supports this contention by directing attention to the portion of the judgment which commits defendant to the county jail until he complies

with the order of the criminal court by producing the records of the corporation, "as specifically designated" in the *subpoena duces tecum*. The quoted words refer to the documents to be produced, rather than to the place of production. The judgment entered August 25, 1950, subsequent to the expiration of the term of the July, 1950, grand jury does not purport to command the production of the corporation's records before that or any other grand jury. Production in the criminal court of the books and records specifically designated in the *subpoena* dated July 19, 1950, would constitute complete compliance with the judgment.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE CRAMPTON, dissenting:

I cannot concur in the decision of the court, nor in the reasoning advanced to support it. In my opinion the *subpoena duces tecum* is much too broad and unreasonable in its terms to justify the judgment of contempt for failure to comply.

We have heretofore held that a *subpoena duces tecum* which in general terms commands the production of all, or even a substantial part, of the records or documents of a person or corporation violates the constitutional protection against unreasonable search and seizure. (*People* v. *Reynolds,* 350 Ill. 11.) In that case a grand jury was investigating the activities of a labor union. Pursuant to an order entered on petition of the State's Attorney, a *subpoena* was issued and served upon Reynolds, its president, commanding him to produce all its records showing the payment of money to the union during a designated two-year period, also a complete record of all disbursements by the union or its agents during the same period, and all books and records containing lists of the members and persons holding permits from the union, with dates of issuance and cancellation thereof, consideration paid

therefor, all copies, drafts and vouchers relating thereto, and all other documents, letters and writings that may afford any information respecting the subject matter of the investigation. Reynolds refused to produce the records, and, after filing an answer to a rule to show cause, was adjudged in contempt of court and fined $100. On writ of error to this court the judgment was reversed. We observed, with reference to the *subpoena duces tecum*: "There is no suggestion respecting the contents of the complaint nor is the nature of the charge indicated. The books, records, documents and correspondence sought are not specified and their relevancy to the charge under investigation is not disclosed. To obey the command of the *subpoena* would require the production of all the books, records and papers of the union covering a period of two years as well as complete lists of members and permit holders irrespective of any time limitation. All the transactions of the union including those wholly unrelated to the subject of the undisclosed inquiry and however innocent, are, by the terms of the *subpoena* to be subjected to the grand jury's inspection. The *subpoena* is neither suitably specific nor properly limited in its scope. It lacks that particularity in description of the books, records or writings demanded which the law requires."

After examining with care the *subpoena* in the case at bar, I can perceive no material difference between its scope and that of the one condemned in the *Reynolds case*. Among other things it demands all records showing cash receipts, cash disbursements, accounts receivable and accounts payable during a period covering a year and a half, and all records showing the accounts of each member belonging to the club for the last three years. In addition, it commands the production of "all copies, drafts, and vouchers relating to said documents, and all other documents, letters and paper writings whatsoever, that can or may afford any information or evidence in said matter."

502

It contains no suggestion concerning the nature of the matter under investigation, but mentions only "a certain complaint" against one George S. May pending before the grand jury. It fails even to intimate what relevancy all the records demanded might have to the undisclosed charge, but demands in sweeping terms the disclosure of every receipt and disbursement of the club, however proper it may be, and the name and account of every member during the designated years. Even in the absence of authority, it should be apparent that such an indiscriminate demand for production of virtually all the books and records of a corporation necessary for the conduct of its affairs is unreasonable and constitutes a flagrant abuse of the judicial process. See *Hale* v. *Henkel,* 201 U. S. 43.

The court here sustains the validity of the *subpoena* by saying its demand "is not unreasonable in view of the subject under investigation—the conduct of gambling operations by a country club." It is not explained why the fact that gambling is being investigated justifies a wholesale and indiscriminate demand for one's books and records or renders inapplicable the rule requiring the *subpoena* to be specific and properly limited in its scope. In *People* v. *Reynolds,* 350 Ill. 11, discussed above, the petition for issuance of the *subpoena* recited that the union's officers had issued many permits to nonmembers authorizing them to operate moving picture machines upon their promises to pay the union ten per cent of their weekly wages; that the money collected from the holders of such permits had not been paid to the union but had been used by the officers for their personal benefit; and that for a number of years no cards had been issued to new members but cards in the names of deceased and disabled members had been issued to men who were not eligible and had not been elected to membership. It was further alleged that, in order to fully investigate the charges in question, it was necessary to examine the books and records of the organi-

zation. It is readily apparent that the activities under investigation in that case were not materially different in scope from the subject of investigation in the case at bar. Moreover, in the present case the petition for issuance of the *subpoena* does not even purport to show the nature of the charges or the relevance of the records demanded, as was done in the *Reynolds case,* but merely alleges that "the books, records, papers and documents hereinafter set forth are necessary and material to be produced before said Grand Jury." Surely the requirement that the person served be informed of the nature of the charge and the relevance of the documents demanded is not satisfied by waiting until the issue is presented to the court by petition for rule to show cause and then for the first time purporting to disclose the information.

The opinion of the majority does not seek to justify the last clause of the *subpoena* but asserts instead that it "is clearly surplusage." It is difficult to understand by what process of reasoning or authority this novel position is supported. It seems clear upon ordinary inspection of the *subpoena* that the clause in question is as much a part of it as the other demands made therein, and that to comply with its command Ryan would have to produce the papers referred to if he had them in his possession. A catchall provision of a similar nature was held invalid in *Bowman Dairy Co.* v. *United States,* 341 U. S. 214, and a judgment of contempt for failure to comply with the *subpoena,* which was otherwise proper in its requirements, was held erroneous. The court said: "One should not be held in contempt under a *subpoena* that is part good and part bad. The burden is on the court to see that the *subpoena* is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad." This language of the United States Supreme Court applies with equal force to the proceedings in the case at bar. Even if remaining portions of the *subpoena* were properly limited

in scope, it should not be incumbent upon Ryan to determine at his peril which of the demands for documents and materials were "surplusage" and which ones were not.

The majority opinion reasons further that a different result is warranted in the case at bar because Ryan failed to move that the *subpoena* be quashed. In my opinion the rule relied upon is not applicable here. Where compulsory process is so broad and unrestricted in scope as to constitute a violation of constitutional protection against unreasonable search and seizure, the party against whom it is directed may refuse to obey, and in a prosecution for contempt may show in defense that it was beyond the authority of the court. *Carden* v. *Ensminger,* 329 Ill. 612; *Lester* v. *People,* 150 Ill. 408.

Aside from the matter of unreasonable search and seizure, I think there still remains a serious question of infringement of the constitutional privilege against self-incrimination. The opinion of the court asserts that in his answer Ryan admitted he was "attorney in fact" of the corporation and in that capacity held possession of the records demanded. Examination of the answer discloses, however, that his authority was created by resolution adopted July 24, 1950, a date subsequent to the service of the *subpoena* upon him, and was restricted to the execution of documents desirable or necessary to protect the constitutional rights of the corporation. His answer contains nothing as to the capacity in which he possessed the records in question. It expressly denies that he is or ever has been a member, officer, director or official of the corporation. It states that the books and records contain matters which would tend to incriminate him, and that their forced production would be compelling him to give evidence against himself in a criminal proceeding. Service of the *subpoena* was not made upon the corporation, nor upon any officer or agent thereof as such, but only upon Ryan as an individual. Moreover, neither the petition for the issuance of the *subpoena* nor

the order directing its issuance contains Ryan's name. His name appears on the *subpoena* written therein in longhand, by whom the record does not disclose. It should be borne in mind that Ryan, himself, was under investigation by this grand jury before the first *subpoena* was issued.

Additional facts, relied upon by Ryan as distinguishing the case at bar from *Wilson* v. *United States,* 221 U. S. 361, and other decisions involving service of *subpoenas duces tecum* upon corporate officers as such, appear of record. But enough has been mentioned here to show that the question presented is not answered by a mere reference to such decisions. Certainly we should not imply, without explanation or discussion, that he was a corporate agent at the time of service upon him, or that agency at such time is immaterial if he subsequently receives authority, however restricted. The decision in the *Wilson case* was based upon the corporation's duty to produce its records or books, and emphasis was placed upon the facts that at all times Wilson was subject to the direction of the corporation and that the books were under its control. The court there said: "When the appellant became president of the corporation, and as such held and used its books for the transaction of its business committed to his charge, he was at all times subject to its direction, and the books continuously remained under its control. If another took his place, his custody would yield. He could assert no personal right to retain the corporate books against any demand of government which the corporation was bound to recognize." If control by the corporation is the reason for denying a person the protection he would otherwise have against being compelled to produce documents in his possession which would incriminate him, it becomes highly important to inquire into the existence and extent of such control in the particular case. In the present case Ryan stated under oath that he was not an officer of the corporation, and that no person other than himself had access

to or knowledge as to the location of the records and books demanded. If the rule of the *Wilson case* is to be extended to one who is neither an officer nor a general agent of the corporation, but is subsequently authorized merely to protect its constitutional rights before a grand jury, the decision should be supported by convincing reasoning and accurate analysis.

As I think the judgment should be reversed on grounds discussed above, I express no opinion concerning the application of the constitutional privilege against self-incrimination. But in my estimation the decision of the court fails to adequately consider the significance of the peculiar facts of the case, and improperly decides the question as if Ryan were at all times equivalent to a duly constituted officer of the corporation, authorized to use its books in the transaction of its business.

I must also express my disagreement with the holding that the sentence to indefinite imprisonment is proper in the present case. Prior to this decision it was considered well settled in this State that imprisonment for a criminal contempt must be for a definite term. (*People* v. *Realich,* 402 Ill. 270; *Rothschild & Co.* v. *Steger Piano Co.* 256 Ill. 196.) The reason for the rule is that in criminal cases the sentence is imposed solely for punitive purposes, and not to compel the performance of acts ordered for the benefit or advantage of a party to the proceeding. Indefinite imprisonment is appropriate only where the sentence is imposed as a remedial measure, to advance the relief granted to a party. Such is not the nature of the present case. There is no contention that it is anything but a criminal contempt, and cases or quotations concerning the dividing line between civil and criminal contempts, or situations resting on the boundary, are irrelevant here.

For this court there is no more important duty than that invoked when constitutional rights are asserted. No more fundamental issue can be presented than the ques-

tion whether the right of the individual shall prevail against the power of the State. In this case, as the court observes, a grand jury was investigating possible violations of anti-gambling laws. Doubtless this is generally considered a worthy undertaking. But the beneficial nature of its purpose should not be allowed to obscure the character of the methods employed to achieve that purpose, nor to justify any relaxation of the vigilance with which this court must protect the rights of persons involved. Constitutional protections are not measured by their effect upon efforts to suppress or punish crime. They must be adhered to firmly, although the result at times may be that crime goes unpunished. It is contemplated by the constitution that such might occur, and that it is a lesser evil than compelling a person to aid in his conviction or subjecting him to unreasonable searches and seizures. In my opinion the constitutional protections of the citizen cannot be disposed of in the summary fashion of this decision. Until now this court has jealously enforced the principles of freedom implicit in the prohibition of unreasonable searches and seizures. Its safeguards should not now be impaired by interpretations which fail to recognize its underlying purpose or by casual and uncritical use of facts. Neither the breadth which the State chooses to ascribe to its investigations, nor considerations of expediency and efficiency, should be utilized to warrant a narrow construction of rights deemed important enough to be made constitutional. The present decision gives the sanction of this court to methods which we have condemned in the past, and which I regard as still offensive to our fundamental conceptions of justice.