STATE OF INDIANA, EX REL. GEORGE MELVIN POLLARD, CHARLES EDWIN BROEKING, WINSTON LEROY CHURCHILL, BEAUFORD D. MARCY, JAMES RAYMOND LANGSFORD, WILLIAM E. OWEN, ROBERT E. MCNEIL, RAYMOND J. STRATTAN, REED MOISTNER, FRANK A. SPALLINA AND MICHAEL SERGI, THOMAS KLEIN *v.* CRIMINAL COURT OF MARION COUNTY, DIVISION ONE, AND HONORABLE JOHN W. TRANBERG.

[No. 375S70. Filed June 11, 1975. Rehearing denied August 12, 1975.]

*John C. Ruckelshaus, Paul G. Roland, Ruckelshaus, Bobbitt & O'Connor,* of Indianapolis, for relators. *David W. Bahlmann,* of Indianapolis, for Amicus Curiae, Indiana Prosecuting Attorneys Council.

*James F. Kelley,* Prosecuting Attorney, *John Muller,* Deputy Prosecutor, for respondents. *Theodore L. Sendak,* Attorney General, *Robert F. Colker,* Assistant Attorney General, for Amicus Curiae, State of Indiana.

HUNTER, J.—Relators, members of the Indianapolis Police Department, commenced this original action for a temporary writ of prohibition after respondent denied their motion to quash a subpoena *duces tecum* ordering them to produce certain financial records before the grand jury. Relators contend that the statutory power of Indiana grand juries to issue subpoenas is limited to the issuance of subpoenas *ad testificandum* and does not include the power to issue subpoenas *duces tecum.* Relators' claim, if valid, would require that the subpoena *duces tecum* be quashed.

Following an emergency hearing on March 20, 1975, with three members of the Court participating, it was our unanimous opinion that relators' claim was not without merit. We, therefore, issued a temporary writ of prohibition ordering the trial court to stay its hand in enforcing the subpoenas. On the basis of briefs submitted by the parties following the emergency hearing, we now dissolve the temporary writ and remand this cause to the trial court for further proceedings not inconsistent with the guidelines enunciated in this opinion.

As a preliminary matter, the Court takes judicial notice that following the granting of the temporary writ, relator

Robert McNeil released certain records to the Marion County prosecutor. To the extent such release is deemed to be in compliance with the subpoena issued to him, his interest in this action is now moot. See *State ex rel. Garber* v. *Circuit Court of Kosciusko County,* (1960) 241 Ind. 133, 170 N.E. 2d 370.

As this opinion was being prepared, a separate grand jury issued identical subpoenas *duces tecum* to relators Sergi and Klein. On April 21, 1975, we modified our temporary writ to include those relators in this cause. In setting out the procedural history which follows, we have referred to the first relators as "original" relators and Sergi and Klein as "additional" relators. The substantive law set forth in this opinion applies to all relators.

We note that original actions are disfavored under our rules. Ind. Rules Proc. for Original Actions, O.A. (A). An original action does not serve as a vehicle for circumventing normal appellate procedures. Thus, the narrow question presented in this action for writ of prohibition is framed in terms of the jurisdiction of the trial court to enter an order enforcing a grand jury subpoena *duces tecum.* More precisely, we are concerned with the antecedent question of whether the prosecutor or the grand jury may subpoena the records of witnesses, which subpoena the trial court sought by its order to enforce. Both parties recognize the extraordinary nature and necessarily limited scope of this writ. *State ex rel. Mock* v. *Whitley Circuit Court,* (1937) 212 Ind. 224, 8 N.E.2d 829. The exercise of this writ as a "strong arm of the court," *State ex rel. Emmert* v. *Hamilton Circuit Court,* (1945) 223 Ind. 418, 61 N.E.2d 182, is limited to deciding whether the court was acting without jurisdiction. If the court had jurisdiction the assertedly improper exercise thereof is ordinarily a matter for appeal. In this case, we resolve the jurisdictional question in favor of the respondents. However, in view of the important issues raised, it is also imperative that we delineate the

trial court's functions vis-a-vis the exercise of the subpoena power by the prosecutor or the grand jury.

Each original relator received two subpoenas, identical in form. The first subpoena was summarily issued on the order of the grand jury, as provided for by Ind. Code § 35-1-15-19, Burns § 9-822, *supra*. A motion to quash was filed. Before the motion could be ruled upon, the term of the grand jury expired. Ind. Code § 35-6-1-1, Burns § 9-819, authorizes the prosecuting attorney to:

> "* * * cause to be issued by the clerk of the circuit court having jurisdiction of the offense, a subpoena for any and all witnesses having knowledge of the commission of any crime in the state, before the beginning of the term of court in the county, requiring such witnesses to appear before any regular session of the grand jury of such county to be thereafter impaneled."

To exercise this authority, the prosecutor must comply with the procedure set forth in Ind. Code § 35-6-1-2, Burns § 9-820, which provides:

> "The prosecuting attorneys within the state in their respective jurisdictions, when in their opinion it is necessary to further the ends of justice, to issue a subpoena, provided in section one [§ 9-819] of this act, shall file with the clerk a praecipe containing the names of all the witnesses he deems necessary for the investigation of any crime or crimes about which they are to testify before such regular session of the grand jury and designate the date upon which said witnesses are required to appear and testify."

and Ind. Code § 35-6-1-3, Burns § 9-821, which provides:

> "Immediately after the filing of such praecipe by the prosecuting attorney with the clerk of the court, as in this act provided, he shall issue a subpoena as therein ordered and immediately deliver the same to the sheriff of such county for service."

The second subpoena, issued under this latter procedure, is the one with which the trial court ordered compliance. The additional relators were issued subpoenas pursuant to Ind. Code § 35-1-15-19, Burns § 9-822, which, because of our modified writ, have not yet been challenged by motions to quash.

Relators place great reliance upon the fact that the powers of the grand jury in this state are controlled by statute. Specifically, relators contend that the emphasized portion of the following statute limits the grand jury subpoena power to the issuance of subpoenas *ad testificandum*. Ind. Code § 35-1-15-19, Burns § 9-822 (1956 Repl.) provides:

> "*Subpoenas for witnesses—Refusal to answer—Oath of witnesses.—Subpoenas for witnesses* before the grand jury shall be issued on the order of the grand jury, if in session, and, if not in session, on the order of the prosecuting attorney; *and such witnesses may be compelled to appear and testify before the grand jury.* If a witness before the grand jury refuse to answer an interrogatory, the fact shall be communicated to the court in writing, in which writing the question to be answered shall be stated, together with the excuse for the refusal, if any be given by the person interrogated; and the court shall thereupon determine whether the witness is bound to answer, and the grand jury shall be immediately informed of the decision. Each witness shall also be sworn not to divulge except when legally called upon to do so, any portion of his testimony before the grand jury, for a violation of which portion of such oath such witness shall be liable to punishment as for a contempt." [Emphasis added.]

In avoidance of relators' invocation of the *expressio unius est exclusio alterius* rationale for interpreting the above statute, respondents assert that legislative policy vis-a-vis the investigative powers of the grand jury require that it be empowered to issue subpoenas *duces tecum*. Respondents find support for their proposition in the charge of the grand jurors' oath to "diligently inquire, and true presentment make of all felonies and misdemeanors, committed or triable within this county of which you shall have or *can obtain* legal evidence." Ind. Code § 35-1-15-7, Burns § 9-807 [emphasis added]. Respondents also emphasize the specific legislative authorization for grand jury investigation "Into willful and corrupt misconduct in office of public officers of every description, and into any charge of extortion preferred against any such officer." Ind. Code § 35-1-15-21, Burns § 9-824. Moreover, respondents urge the applicability to grand jury proceedings

of Ind. R. Crim. P. 2, which provides for subpoenas *duces tecum* in criminal proceedings.

I

The grand jury is an ancient institution with roots older than this state and the United States. The first criminal grand jury was established by the crown in 1164, to provide the centralized government with the benefit of local knowledge in the apprehension of criminals. The first grand jury was composed of twelve knights whose duty was to accuse those who, according to public knowledge, had breached the king's laws. See 2 Pollock & Maitland, *The History of English Law*, 642 (2d ed. 1959). As the institution developed, the grand jury acquired a protective role in the criminal justice system through its power to refuse to return a true bill against those whom it believed to be innocent. Thus, the grand jury stood as a shield between the citizen who had incurred the wrath of the crown and was therefore being prosecuted on trumped-up charges. The dual function of the English grand jurors is expressly embodied in their oaths that ". . . they would accuse none whom they believed innocent, nor conceal any whom they thought guilty." Washburn, *Manual of Criminal Law*, 122 (1878).

Although not a part of the original Constitution of the United States, the grand jury system was early implemented by the fifth amendment, which provides that, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury. . . ." The framers of the Indiana Constitution of 1816 gave credence to the protective function, as well as the accusatory function, of the grand jury in the adoption of Section 12. That section provided:

"That no person arrested, or confined in Jail shall be treated with unnecessary rigour, or be put to answer any criminal charge, but by presentment Indictment, or impeachment."

Kettleborough, *Constitution Making in Indiana,* 86 (Indiana Historical Collectoin, Vol. 1, 1934).

The next significant development in the history of the grand jury in Indiana was the adoption of the Constitution of 1851. Article 7, § 17 thereof, provided that, "The General Assembly may modify, or abolish, the Grand Jury system." This provision was recently reaffirmed by the people of this state in their ratification of the new Judicial Article adopted in 1970. An understanding of the origins of this provision is critical in determining whether it was intended as a limit upon the *breadth* and *implementation* of the investigatory powers of the grand jury.

A study of the debates of the Indiana Constitutional Convention of 1850 reveals delegates were concerned with the ineffectiveness, duplicity, expense, inconvenience, and secrecy of grand jury proceedings and not with the scope of the grand jury's powers. The legislation implementing Section 12 of the Constitution of 1816 required the grand jury to pass on *all* crimes, even petit offenses. Hence, the grand jury system was indictable for duplicity, since the grand jurors sat to review determinations already once made by a justice of the peace. See 1 *Debates in Indiana Convention* 1850, 140, 154 (Ind. Historical Collections Reprint, 1935) [hereinafter cited as *Debates*]. The grand jury system was expensive; grand jurors received a dollar and twenty-five cents per diem allowance, estimated to cost Indiana taxpayers some twenty thousand dollars annually. 1 *Debates* 137. The grand jury was said to be ineffective, since twenty indictments returned would yield an average of only one conviction. 1 *Debates* 160. The fact that grand jury proceedings were secret was labeled "anti-American." 1 *Debates* 149-50. It was urged that the grand jury, if retained, be required to conduct its examinations in public, as a check upon its own capricious action. 1 *Debates* 150, 184. Finally, opponents of the grand jury noted the inconvenience and hardship befalling "those citizens who are compelled to leave their families and their

ordinary avocations of business to appear as witnesses against men guilty of the most trivial offences." 1 *Debates* 144.

The proposal originally before the Constitutional Convention of 1850 was to abolish the grand jury system. The objections set out above were met with strong rebuttal. Article 7, § 17, *supra,* was the compromise finally agreed upon by the delegates. The compromise squarely placed the ultimate de-decision for abolition, retention or modification of the grand jury system upon the General Assembly. Case law reviewing this provision has uniformly recognized the de-constitutionalizing effect of this Article and regarded it as de-emphasizing the role of the grand jury in Indiana criminal justice. See *King* v. *State,* (1957) 236 Ind. 268, 139 N.E.2d 547; *State* v. *Roberts,* (1906) 166 Ind. 585, 77 N.E. 1093; *Welty* v. *Ward,* (1905) 164 Ind. 457, 73 N.E. 889, *compare* Wright, 1 *Federal Practice and Procedure* § 101 (1969). Notwithstanding the correctness of our previous assessments of this provision, it remains a fact that the General Assembly has neither abolished the grand jury nor sought to tie its hands by making its examinations open to the public. It has been nearly a century and a quarter since Article 7, §17, was adopted. We can only conclude that the legion of legislators who have met since 1851 have apparently determined that the benefits to be derived from the grand jury system exceed its costs and detriments.

In view of this background, we now turn to relators' contention that Ind. Code § 35-1-15-19, Burns § 9-822 (1956 Repl.) may only be read as permitting the grand jury, or the prosecutor during vacation, to issue subpoenas *ad testificandum* to prospective witnesses before the grand jury. The statute provides in pertinent part, "Subpoenas for witnesses before the grand jury shall be issued on the order of the grand jury, if in session, and, if not in session, on the order of the prosecuting attorney; *and such witness may be compelled to appear and testify before the grand jury. . . .*" [Emphasis added.]

The purpose and meaning of the term subpoena was ex-explained in *Alexander* v. *Harrison*, (1891) 2 Ind. App. 47, 53, 28 N.E. 119, 121. The Indiana Appellate Court stated:

"The purpose of a subpoena is to place the witness under the 'order and censure' of the court, and a writ which does not effect this is not a subpoena within the meaning of the law. 1 Thompson Trials, section 160; 1 Greenl. Evidence, section 315.

"Bouvier defines this writ as 'A process to cause a witness to appear and give testimony, commanding him to lay aside all pretences and excuses, and appear before a court or magistrate therein named, at a time therein mentioned, to testify for the party named, under a penalty therein mentioned.'"

At common law, two writs of subpoena were recognized. The subpoena *ad testificandum* was a writ to compel a witness to appear and testify. *Catty* v. *Brockelbank*, (1940) 124 N.J.L. 360, 12 A. 2d 128. The subpoena *duces tecum* was a more extensive writ requiring the witness to bring with him and produce to the court books, papers, etc., in this hands, which would elucidate the matter in issue. *People ex rel. Metropolitan Casualty Ins. Co. of New York* v. *Calumet Nat'l Bank*, (1931) 260 Ill. App. 603.

It has long been recognized that a primary function of the grand jury is to conduct investigations which have been pejoratively called inquisitions. A classic statement of the investigative function appears in *Hale* v. *Henkel*, (1906) 201 U.S. 43, 26 S. Ct. 370, 50 L. Ed. 652. In the opinion by Mr. Justice Brown, the U.S. Supreme Court stated:

"We deem it entirely clear that under the practice in this country, at least, the examination of witnesses need not be preceded by a presentment or indictment formally drawn up, but that the grand jury may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire for themselves whether a crime cognizable by the court has been committed; that the result of their investigations may be subsequently embodied in an indictment, and that, in summoning witnesses, it is quite sufficient to

apprise them of the names of the parties with respect to whom they will be called to testify, without indicating the nature of the charge against them. So valuable is this inquisitorial power of the grand jury that, in states where felonies may be prosecuted by information as well as indictment, the power is ordinarily reserved to courts of impaneling grand juries for the investigation of riots, frauds, and nuisances, and other cases where it is impracticable to ascertain in advance the names of the persons implicated. It is impossible to conceive that in such cases the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted. As criminal prosecutions are instituted by the state through an officer selected for that purpose, he is vested with a certain discretion with respect to the cases he will call to their attention, the number and character of the witnesses, the form in which the indictment shall be drawn, and other details of the proceedings. Doubtless abuses of this power may be imagined, as if the object of the inquiry were merely to pry into the details of domestic or business life. But were such abuses called to the attention of the court, it would doubtless be alert to repress them. While the grand jury may not indict upon current rumors or unverified reports, they may act upon knowledge acquired either from their own observations or upon the evidence of witnesses given before them." 201 U.S. 43, 65-66, 26 S. Ct. 370, 375, 50 L. Ed. 652, 661-662.

We have previously recognized that a successful completion of the inquisitorial tasks assigned to the grand jury requires that the grand jury have a latitude in its proceedings which would not be acceptable in a criminal prosecution. Thus, in *State* v. *Turley*, (1899) 153 Ind. 345, 374, 55 N.E. 30, we stated:

"The duty of the grand jury is to 'diligently inquire,' to obtain 'legal evidence', to discover and detect crime, and for that purpose they have the right to interrogate witnesses concerning all matters which may tend to accomplish that result. It is evident that the grand jury in making the investigation, required by law, may require witnesses to testify concerning matters not admissible on the trial of a cause.

"It is true that an indictment should be returned upon 'legal evidence', but the grand jury may require witnesses

to answer questions tending to show where and from whom they may obtain such evidence. All such testimony before the grand jury is therefore 'touching a matter material to the point in question.' "

The power broadly conferred upon grand juries has undoubtedly occasioned abuses. But the grand jury remains under the supervision of the court which convenes it, *State ex rel. Meloy* v. *Barger*, (1949) 227 Ind. 678, 88 N.E.2d 392, and both the trial court and this Court stand ready to protect a citizen from interference which exceeds that which all of us must endure to live under a system of laws. Judge Emmert expressed our commitment in *State ex rel. Reichert* v. *Youngblood*, (1947) 225 Ind. 129, 141-42, 73 N.E.2d 174, 179:

> "The grand jury is a powerful arm of the court. When properly used it can be a great force in helping protect the rights of society against those who would corrupt our government or jeopardize our rights to life, liberty and the pursuit of happiness by their antisocial and criminal acts. The grand jury operates in strict secrecy. None of its members can be subject to malicious prosecution. Its integrity should be above any reasonable suspicion. Its members should act freely and fearlessly. But there is always great danger where great power is conferred. Under the growth of the grand jury system in England at one time it was considered a great protection against the oppression of the Crown. Today it should still continue a great protection for the individual citizen against improper prosecution. It should never be permitted to become an engine of oppression or an instrument of defamation.
>
> "It has always been a general principle under our legal system that for every wrong there should be a remedy. Our own Bill of Rights in Art. 1, § 12 of the Constitution of Indiana, provides:
>
>> " 'All courts shall be open; and *every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law.* Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.' (Italics added.)"

The grand jury as a powerful arm of the court has not been withered by the legislature. In view of its broad purpose

in ferreting out criminal conduct, we are reluctant to wither that arm by reading the statute as relators would have us read it. To do so would render the legislative command to the grand jury to inquire into "wilful and corrupt misconduct in office of public officers of every description," Ind. Code § 35-1-15-21, Burns § 9-824 (1956 Repl.), a nearly impossible task. If the personal records of public officials bear the indelible marks of illegal conduct, those records should, with proper safeguards, be made available for the grand jury's inspection. We, therefore, conclude that the grand jury may require witnesses to produce papers and documents relevant to the grand jury investigation.

In addition to the non-prohibitive character of Article 7, § 17, and that section's history, the general nature of the grand jury system and the legislative mandate to investigate corruption of public officials, our decision today finds solid support in previous opinions of this Court. In *Baldwin* v. *State,* (1890) 126 Ind. 24, 25 N.E. 820, Baldwin had been subpoenaed to appear before the grand jury of the Blackford Circuit Court. When Baldwin failed to observe the subpoena, a writ of body attachment issued. Baldwin was released upon recognizance, but when he failed to appear, a suit to forfeit his bond was commenced. On appeal from the order of forfeiture, it was contended that he was never in contempt, for the statutes then in effect gave the clerk no express authority to issue subpoenas for witnesses before the grand jury. After reviewing the statutes relating to securing witnesses at trial, payment of costs and witness fees, duties of the sheriff, and compelling witnesses' attendance before the grand jury, the Court in *Baldwin* quickly dispatched Baldwin's contention, noting that:

". . . it can hardly be claimed that the clerk of the circuit court, whose duty it is to issue all processes for the court, is not authorized to issue subpoenas to be served upon witnesses in criminal cases in the absence of an express statute conferring such authority. Such a holding by this court would be in opposition to the evident intention of the

Legislature, the long-continued practice to the contrary, and would go very far to obstruct a proper enforcement of the law against those who violate it." 126 Ind. 24, 29, 25 N.E. 820, 821.

*Baldwin's* recognition of the weighty factor of "long-continued practice," when a statute does not expressly speak to the particular question before the court, is particularly apropos in this case. In *State* v. *Pence*, (1909) 173 Ind. 99, 89 N.E. 488, a grand jury investigating violations of the "blind tiger law" ordered druggist Pence to appear and produce the prescriptions and applications which he had filled for vinous or spirituous liquors. After complying with the subpoena, Pence was indicted. On appeal, the druggist's plea in abatement was upheld on the basis that the statute requiring that druggists maintain certain records of sales of intoxicating liquors did not also make such records open to public inspection and, therefore, a druggist could not be compelled to disclose such applications where the purpose is to prosecute him for illicit sales. Specifically, the Court held in *Pence* that:

". . . under the statute now before us, a druggist or pharmacist cannot be compelled to produce, for use as evidence before a court or grand jury, in a proceeding where such use may tend to incriminate himself, prescriptions and applications for intoxicating liquors sold by him." 173 Ind. 99, 104, 89 N.E. 488, 490.

At this point, *Pence* is significant because it indicates that the practice of the grand jury issuing subpoenas *duces tecum* is not uncommon, and may amount to the "long-continued practice" mentioned in *Baldwin*. We consider in Part III, *infra*, the second aspect of *Pence* that a person ordered to comply with a subpoena *duces tecum* does not forgo the opportunity to assert his rights against self-incrimination.

Another example of the apparently pervasive usage by the grand jury of the subpoena *duces tecum* appears in *dicta* in *Baker* v. *State*, (1914) 183 Ind. 1, 108 N.E. 7, 8:

"It will be observed that the witness was not ordered to produce the books of the bank showing the accounts of all its depositors in obedience to the subpoena *duces tecum*,

and appellant was not called upon to show cause why he should not be punished for a failure to comply with such an order. For this reason we are not required in this case to determine whether such an order would constitute an unreasonable search and seizure of the private papers and effects of the bank within the meaning of § 11, Art. 1 of our State Constitution securing the people of the State against such unreasonable searches and seizures."

The Court in *Baker* thus implicitly suggested that a subpoena *duces tecum,* drawn within constitutional limits, would lie to procure the information which the grand jury was seeking. The conclusion here drawn as to the import of the *dicta* in *Baker* is compelled by the holding in that case. In *Baker,* the grand jury was investigating alleged perjury of certain individuals in completing their personal property assessment forms. To ascertain whether these individuals had funds on deposit, which were not reflected in their returns, the grand jury subpoenaed the cashier of a local bank. When asked the amount on deposit for one Brown, the cashier refused to answer on the grounds that he could not tell without referring to his ledger books, and that the grand jury had no right to ask such a question. The cashier's objections were overruled, and the court ordered him to refer to his books and answer, but did not order him to produce the books. Upon his refusal, the cashier was held in contempt and fined. On appeal, the thrust of appellant's complaint was that he would be required to consult his ledger, and to do so would be in violation of Article 1, § 21, of the Indiana Constitution requiring appellant to perform services not ordinarily required of a witness, and without just compensation. The Court tersely dismissed appellant's claim, stating:

"A similar question was presented and decided adversely to appellant's contention in the case of *Washington Nat. Bank* v. *Daily,* (1906) 166 Ind. 631, 77 N.E. 53." 183 Ind. 1, 6, 108 N.E. 7, 9.

In affirming appellant's contempt conviction, the Court recognized the broad inherent powers of the court convening the grand jury to assist the grand jury's investigation by ordering

a witness, under an ordinary subpoena, to do all things which a subpoena *duces tecum* might compel him to do with the exception of actually turning over the records. The Court stated it thusly:

"Where the source of the information is exclusively or peculiarly within the control of the witness, the court, acting within reasonable bounds and in the exercise of a sound discretion, may require the witness to avail himself of such information and to communicate it to the court." 183 Ind. 1, 6, 108 N.E. 7, 9.

The position taken on the merits in *Baker* amply demonstrates the commitment of this Court and the trial courts to assist legitimate grand jury inquiry conducted by reasonable methods. We affirm that commitment by holding that Ind. Code § 35-1-15-19, Burns § 9-822 (1956 Repl.) permits the grand jury, or the prosecutor if the grand jury is in vacation, to issue subpoenas *duces tecum* to prospective witnesses before the grand jury. We must now examine the constitutional safeguards which inhere to the witnesses' benefit.

## II

The fourth amendment to the United States Constitution reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article 1, Section 11, of the Indiana Constitution reads:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The fourth amendment prohibits unreasonable searches and seizures. Such prohibitions are inapplicable to subpoenas

*duces tecum,* for the reason that subpoenas are incapable of accomplishing the constitutionally proscribed conduct. As stated by the U.S. Supreme Court in *Oklahoma Press Publishing Co.* v. *Walling,* (1945) 327 U.S. 186, 195, 66 S. Ct. 494, 90 L. Ed. 614, 622:

> "No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made."

Moreover, the same court has recently held the exclusionary rule of the fourth amendment inapplicable in grand jury proceedings, rejecting the contention that each question before the grand jury based on illegally obtained evidence constituted a fresh violation of the witness's fourth amendment rights. *U.S.* v. *Calandra,* (1974) 414 U.S. 338, 94 S. Ct. 613, 38 L. Ed. 2d 561. In so holding, the Supreme Court stated:

> "In the context of a grand jury proceeding, we believe that the damage to that institution from the unprecedented extension of the exclusionary rule urged by respondent outweighs the benefit of any possible incremental deterrent effect." 414 U.S. 338, 354, 94 S. Ct. 613, 623, 38 L. Ed. 2d 561, 575.

The contours of the constitutional right to privacy screen relationships and decisions relating to marriage, procreation, motherhood, child rearing and education from public intrusion and interference when there is a legitimate expectation of privacy. See *Paris Adult Theatre I* v. *Slaton,* (1973) 413 U.S. 49, 93 S. Ct. 2628, 37 L. Ed. 2d 446. Although the precise locus of this constitutional right of privacy varies, see *Roe* v. *Wade,* (1973) 410 U.S. 113, 152-154, 93 S. Ct. 705, 35 L. Ed. 2d 147, 176-78, nevertheless, the right to privacy as it emanates from the fourth amendment undoubtedly protects "the myriad activities that may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public." *U.S.* v. *Orito,* (1972) 413 U.S. 139, 143-44, 93 S. Ct. 2674, 2677, 37 L. Ed. 2d 513, 518. The right of privacy when

asserted as a bar to state intrusions in situations not involving intimate and familial relationships, becomes less compelling and subject to reasonable public intrusion. So it is that a witness, subpoenaed to produce his records to a grand jury seeking to discover therefrom whether an indictable offense has been committed, may not assert his fourth amendment expectation of privacy in such records, nor the infringement of such right owing to any embarrassment resulting from their limited disclosure to the grand jury, as a bar to production. Affirming our conclusion, the *Calandra* decision, referred to above, states at 414 U.S. 338, 353, 94 S. Ct. 613, 622, 38 L. Ed. 2d 561, 574:

> "Ordinarily, of course, a witness has no right of privacy before the grand jury. Absent some recognized privilege of confidentiality, every man owes his testimony. He may invoke his Fifth Amendment privilege against compulsory self-incrimination, but he may not decline to answer on the grounds that his responses might prove embarrassing or result in an unwelcome disclosure of his personal affairs. Blair v. United States, 250 U.S. 273, 63 L. Ed. 979, 39 S. Ct. 468 (1919)." *Compare U.S. v. Dionisio,* (1973) 410 U.S. 1, 93 S. Ct. 764, 35 L. Ed. 2d 67.

The fourth amendment requirement of "probable cause, supported by oath or affirmation" is literally applicable only to warrants. See *Oklahoma Press Publishing Co.* v. *Walling,* (1945) 327 U.S. 186, 209, 66 S. Ct. 494, 90 L. Ed. 614, 630. Nevertheless, fourth amendment requirements of probable cause have been interpreted as applicable to subpoenas *duces tecum* to the extent that the grand jury or the prosecutor in issuing such subpoenas may not act arbitrarily or in excess of their statutory authority. In the case before us, no claim is presented that the grand jury was acting beyond the scope of inquiry authorized by Ind. Code § 35-1-15-21, Burns § 9-824. Nor is any claim advanced that relators were arbitrarily subpoenaed merely because of their status as public officers. We do not find any basis in the record before us for either of these claims. If a basis in fact existed, a timely motion to quash

the subpoena would have been the proper procedural vehicle to assert it.

The greatest protection which the fourth amendment affords a witness subject to a grand jury subpoena *duces tecum* is the requirement of reasonableness. This requirement, articulated in *Oklahoma Press Publishing Co.* v. *Walling*, (1945) 327 U.S. 186, 209, 66 S. Ct. 494, 506, 90 L. Ed. 614, 630, includes:

> ". . . particularity in 'describing the place to be searched, and the persons or things to be seized,' . . . [and] comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevancy and adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry."

And as summarized in *See* v. *City of Seattle*, (1967) 387 U.S. 541, 544, 87 S. Ct. 1737, 1740, 18 L. Ed. 2d 943, 947, the requirement is "that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome."

The standard of reasonableness necessarily connotes a fact-sensitive inquiry. It is obvious that it cannot be left to the witness to decide whether he will withhold documents because he regards them as irrelevant to the grand jury inquiry, or because their production would be a bother. A witness desiring to raise objections must do so immediately upon receipt of the subpoena *duces tecum* by presenting a motion to quash to the court which convened the grand jury. The motion to quash must include a specific statement of the facts and grounds in support of the objection. The court shall promptly conduct a hearing on the motion, at the conclusion of which it shall enter of record its conclusion supported by specific findings.

With regard to the realm of permissible grand jury inquiry, the court is to be guided by the statute, Ind. Code § 35-1-15-21,

Burns § 9-824. In regard to questions of specificity, relevancy and control, we commend the court's attention to the cases collected in VIII *Wigmore On Evidence* § 2200, 127-130, nn. 7-9 (McNaughton Rev. 1961).

In addition, the standard of reasonableness obviously requires that a witness be not compelled to produce that which he does not possess. Whether an item is in the witness's control is a question of fact to be determined by the court. Nor is a witness required to place the information sought in any particular format. Because of the vast resources available to the grand jury through the prosecutor's office, we believe any demand for public records pertaining to the witness is unreasonable. Finally, in a proper case, for example where production is sought of books or accounts currently in use, the court in its discretion may condition the production upon payment by the state of the necessary and reasonable costs of reproduction.

In the case before us, the original relators' motion to quash was sustained insofar as it required the production of records of the immediate family of each relator. Minute Sheet, 3-11-75. The subpoena defined immediate family as "spouse, son, daughter, adopted son or daughter, and stepson or stepdaughter." If this determination of the court is premised upon the facial invalidity of subpoenas which purport to command relators to produce papers in the possession of another, we affirm. If the court's action reflects a determination that documents of the immediate family which were in the possession of relators bore no relation to the grand jury inquiry, we are unable to affirm such decision on the basis of the record before us. The court is ordered on remand to make a proper record if the latter determination was in fact a ground upon which the limited motion to quash was sustained.

On remand, the court must consider whether any of the requested items seek information ascertainable from public records, which the prosecutor must produce, or if any of

the requested items are intended to require the witness to place the information sought in a particular format. On this latter point we direct the trial court specifically to item eleven which seeks "A statement of the net worth of you and your immediate family, separately stated and itemized."

### III

The fifth amendment privilege against self-incrimination is operative in state criminal proceedings. *Malloy* v. *Hogan*, (1964) 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653. In addition, Article 1, § 14, of the Indiana Constitution provides in relevant part that "No person, in any criminal prosecution, shall be compelled to testify against himself." Long before the fifth amendment privilege became applicable in state proceedings, this Court outlined the general applicability of the Art. 1, § 14, privilege to grand jury proceedings. Thus, in *State* v. *Comer*, (1901) 157 Ind. 611, 613, 62 N.E. 452, 453, we stated:

> "Being subpoenaed, and appearing before the grand jury and being sworn, was not a violation of appellee's constitutional rights, and while before the grand jury he could be compelled to testify to any matter which did not criminate him. Under the provision of the Constitution of this State above quoted, he could not, however, be compelled to testify before the grand jury to any matter that would criminate him. Whether he should so testify was, therefore, a personal privilege which he could claim or not as he chose. If he gave such criminating evidence voluntarily, his constitutional rights were not violated. It is a general rule that when a personal privilege exists for a witness to testify or not as he chooses, if he does testify without objection he will be deemed to have done so voluntarily."

See also *State* v. *Turley*, (1899) 153 Ind. 345, 55 N.E. 30; *accord U.S.* v. *Hoffman*, (1951) 341 U.S. 479, 71 S. Ct. 814, 95 L. Ed. 1118.

The privilege against self-incrimination, whether grounded in the constitution of our state or the Bill of Rights, has been jealously protected by the judiciary. The decision of the

United States Supreme Court in *Miranda* v. *Arizona*, (1966) 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, is a legendary example of the judiciary's abiding commitment to sustenance of the right. Children too young to know the three branches of government are quite capable of parroting the *Miranda* rights when playing cops and robbers. With maturity comes an appreciation of the significance in our scheme of government of the right of an accused to remain silent. As stated in *Brown* v. *Walker*, (1896) 161 U.S. 591, 596-97, 16 S. Ct. 644, 647, 40 L. Ed. 819, 821:

> "So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."

Bars to free exercise of the privilege are not to be erected haphazardly. "To apply the privilege narrowly or begrudgingly—to treat it as an historical relic, at most merely to be tolerated—is to ignore its development and purpose." *Quinn* v. *U.S.*, (1955) 349 U.S. 155, 75 S. Ct. 668, 99 L. Ed. 964. The invocation of the privilege by one seeking to claim it may not be made onerous by the requirement of some fixed incantation—if the privilege is claimed in any language which may reasonably be expected to be understood as asserting the privilege, it must be respected by the grand jury and by the court. *See Quinn, supra.* Nor has judicial concern for the protection of the privilege been limited to procedural impediments to its exercise. In *Overman* v. *State,* (1923) 194 Ind. 483, 488, 143 N.E. 604, 605, we quoted with approval the following language on the scope of the privilege from Aaron Burr's Trial:

> " 'Many links frequently compose that chain of testimony which is necessary to convict an individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible, but a probable,

case that a witness by disclosing a single fact may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe, but draw it from thence and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description.' "

While the witness must claim his privilege and show some basis for the claim, it is clear that the successful assertion of the privilege does not turn upon the ordeals of proof required at trial. *U.S.* v. *Hoffman, supra*. As stated in *U.S.* v. *Coffey*, (1952, 3d Cir.) 198 F. 2d 438:

"It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in the circumstances of the particular case. It is in this latter connection, the credibility of the suggesting connecting chain, that the reputation and known history of the witness may be significant.

"Finally, in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical; rather must he be acutely aware that in the deviousness of crime and its detection incrimination may be approached and achieved by obscure and unlikely lines of inquiry."

The constitutional privilege against self-incrimination accompanies all who appear before the grand jury. *Counselman* v. *Hitchcock*, (1892) 142 U.S. 547, 12 S. Ct. 195, 35 L. Ed. 1110. A meaningful decision to exercise that privilege requires certain knowledge on the part of the witness. First, the witness must know that the privilege exists, and how and when he may claim it. Second, a witness must know the general nature of the grand jury investigation, so that he may determine whether facts secreted within his own bosom, if elicited, may tend to criminate him.

## A. INFORMING THE WITNESS OF THE PRIVILEGE

Due regard for the privilege against self-incrimination requires that each person appearing before the grand jury, after being sworn, but prior to any questioning, be advised of the privilege and instructed that he may claim it at any point in the proceeding if he determines that his answer may criminally implicate him. This warning must be given by the prosecutor, or in his absence, by the foreman of the grand jury. Only when the individual subpoenaed to testify before the grand jury is made aware of his right against self-incrimination may he then make the knowing and voluntary waiver of that right if he chooses to testify before the grand jury.

Although a person standing charged by affidavit,[1] and who is subpoenaed for grand jury review of the same act, should have previously been advised of such right, repetition when liberty is at stake requires no further justification. In the case where the witness is himself the subject of the investigation and chooses to testify, a warning is also mandated, for

---

1. Under Ind. Code § 35-1-15-21, Burns § 9-824 (1956 Repl.), the grand jury is empowered to investigate:

"First. *Into the case of every person imprisoned in the county jail on a criminal charge, and not indicted.* Second. *Into the case of every person under bail in said county to answer a criminal charge, and* not indicted. Third. Into wilful and corrupt misconduct in office of public officers of every description, and *into any charge of extortion preferred against any such officer.* Fourth. Into the condition and management of the public prisons and poorhouses in the county. Fifth. Into violations of the criminal laws of this state generally, of which the court has jurisdiction." [Emphasis added.]

The italicized portion of this statute delimits a class of citizens who have already been charged by affidavit, and who are therefore defendants in pending criminal prosecutions, see Winston v. State, (1975) 263 Ind. 8, 323 N.E.2d 228. When the grand jury summons such an individual before it, and seeks to investigate the specific offense or offenses with which that individual stands charged, then that individual need not wait until he is asked a specific question to claim the privilege, but may steadfastly maintain his right to remain silent from the outset. Miranda v. Arizona, supra; Massiah v. U.S., (1964) 377 U.S. 201, 84 S. Ct. 1199, 12 L. ed. 2d 246. Nor may production of such an individual's papers be compelled by a subpoena *duces tecum.* The same is true of any person who is under investigation for possible indictment by the grand jury.

the grand jury seeks from him the very evidence upon which it may return a true bill and thrust him into the role of an accused. Finally, we require that the warning be given even to the ordinary witness, for the grand jury of its own volition may at any point shift directions if it detects a "violation of the criminal law of the state generally," and thus an ordinary witness may become the subject of the grand jury investigation.

## B. INFORMING THE WITNESS OF THE SUBJECT MATTER OF THE GRAND JURY INVESTIGATION

In order to safeguard his constitutional rights, a witness summoned to testify or produce records before the grand jury must be advised of the general nature of the grand jury inquiry. See *People* v. *Ryan*, (1951) 410 Ill. 486, 103 N.E.2d 116. We require that such information be contained in the subpoena. When a witness receives a subpoena *duces tecum* advising him of the subject matter of the grand jury investigation, he may then determine whether he should file a motion to quash the subpoena for the reason that the demand for production is unreasonable under the fourth amendment because such papers are not related to the purpose of the investigation.

Knowledge of the general nature of the grand jury investigation is beneficial to the timely assertion of fifth amendment rights. With regard to the right against self-incrimination, a witness who is apprised of the subject matter of investigation prior to being ushered into the grand jury room will be able to contemplate his knowledge of the subject unhampered by the nervousness and excitement which accompany an appearance before the grand jury. When the witness responds to the subpoena and is advised of his privilege aganst self-incrimination, he will be prepared to claim the privilege in a more timely fashion, since he will already have in mind the facts upon which the claim of privilege could rest.

When a witness stands charged by affidavit, and the grand jury calls the witness for the purpose of returning an indictment on that charge, knowledge of the nature of the grand jury investigation is imperative so that the witness may consult with counsel and determine whether he desires to appear and testify. The decision to appear and testify is wholly optional with an accused, because, procedurally, it has been decided that the best way to maintain inviolate his fifth amendment rights is to provide him with the simple expedient of refusing to assist in any way in the procurement of his conviction, rather than requiring him to claim the privilege as a witness must, i.e., in regard to specific questions. See *Malloy* v. *Hogan, supra; Boyd* v. *U.S.*, (1886) 116 U.S. 616, 6 S. Ct. 524, 29 L. ed. 746; cf. *Schmerber* v. *California*, (1966) 384 U.S. 757, 86 S. Ct. 1826, 16 L. ed. 2d 908. Hence, an accused who refuses to comply with either a subpoena *duces tecum* or a subpoena *ad testificandum* may not be held in contempt.

We believe this same broad protection is available when the purpose of the grand jury investigation is to gather evidence to indict a particular witness, whether by his testimony or through production of his papers. See *People* v. *Laino*, (1961) 10 N.Y. 2d 161, 218 N.Y.S. 2d 647, 176 N.E.2d 571, *appeal dismissed, cert. denied*, 374 U.S. 104, 83 S. Ct. 1687, 10 L. Ed. 2d 1027 (1963); McCORMICK ON EVIDENCE (2d ed., 1972) § 130. A witness so informed of the purpose of the investigation by his subpoena will be able to exercise his sixth amendment right to counsel and decide whether to participate in the grand jury proceeding. The subpoena must necessarily advise such witness of his right to counsel, either retained or appointed. Of course, the duty to determine and advise a particular witness that he is to be indicted if sufficient evidence is adduced falls upon the prosecutor or grand jury foreman. In most cases, there will be no difficulty in determining the appropriateness of these additional warnings. When the prosecutor or grand jury foreman elicits testimony by intentionally

failing to advise a witness that he is the subject of the investigation, any indictment returned against him would be subject to a motion to quash.

## C. HOW AN ORDINARY WITNESS MAY CLAIM THE PRIVILEGE

An ordinary witness (one who is neither charged by affidavit nor the subject of the investigation, see B *supra*) may not automatically assert his fifth amendment rights upon his arrival at the grand jury room. To do so would allow the privilege:

> ". . . [to] be put forward for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person, who is interested in concealing the facts to which he would testify. Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding his own good name, to be made the tool of others, who are desirous of seeking shelter behind his privilege." *Brown* v. *Walker, supra.*

Hence, an ordinary witness must be sworn and asked a question which he believes may incriminate him. At this point he may refuse to answer, claiming his constitutional privilege. The propriety of his refusal to testify must then be determined in a hearing before the court which has convened the grand jury. Since grand jury proceedings are by statute non-public in nature, and disclosure of such proceedings by a grand juror or a witness will subject him to penalties, and since the hearing is an adjunct to the grand jury proceedings, we require that the hearing be held *in camera*. In regard to the merits of the asserted privilege, the trial court is to be guided in its determination by the standards enunciated in *U.S.* v. *Coffey, supra.* In the case of a subpoena *duces tecum* directed to an ordinary witness, the inquiry will entail an examination of the documents by the court to determine whether the asserted privilege is well founded. If the trial court determines that the question

is not criminating, then the witness must return to the grand jury and answer. If the trial court upholds the privilege, the following statute becomes relevant:

"Any witness, in any criminal proceeding, before a court or grand jury, who refuses to answer any question and/or produce any evidence of any kind on the ground that he may be incriminated thereby, may be ordered by the court to answer any question and/or produce any evidence upon a written request by the prosecuting attorney: Provided, That the witness shall be provided with timely notice and a separate hearing on the merits of the order. Unless the court finds that the issuance of the order would be clearly contrary to public interest, the witness shall comply with the order of the court. If, but for this section the witness would have been privileged to withhold the answer given or the evidence produced, he shall not be prosecuted or subjected to penalty or forfeiture for or on account of any answer given or evidence produced: Provided, further, That such immunity shall not be allowed in the case of any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order of the court." Ind. Code § 35-6-3-1, Burns § 9-1601a.

Under this statute, the prosecutor may secure the testimony or evidence protected by the constitutional privilege by extending to the witness an immunity which is coextensive with the privilege being relinquished. See *Overman* v. *State*, (1923) 194 Ind. 483, 143 N.E. 604; *accord Kastigar* v. *U.S.*, (1972) 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212.

The statute was adopted by the General Assembly in 1969, and is patterned after the Model State Witness Immunity Act, 9 C *Uniform Laws Ann.* 206 (1957). In the comments to the model act, we find the following statement:

"The phrase 'produce evidence of any other kind' is a revision of the frequently careless terminology used in immunity statutes to refer to evidence other than oral testimony." 9 C *Uniform Laws Ann.* 189 (1957).

The only modification which the General Assembly made with regard to the foregoing phrase was to insert the word "any" between "produce" and "evidence"—thus broadening the po-

tential types of evidence of which production might be required. We believe the adoption of this act, as it relates to grand jury proceedings, evidences a clear legislative intent to facilitate the grand jury investigations authorized by statute.

## D.  CONCLUSIONS ON ASSERTION OF FIFTH AMENDMENT PRIVILEGE

If relators are the subject of the grand jury investigation, they must be so informed and afforded their rights as outlined in B, *supra*. If relators are to appear before the grand jury as ordinary witnesses, then they must be informed of the privilege against self-incrimination and may claim it as outlined in C, *supra*. To expedite grand jury proceedings, while at the same time preserving the witness's constitutional privileges, we believe the preferred procedure is to present the witness with all questions, allow him to respond or claim his constitutional privilege, and then resort to the court for a determination of whether the privilege was properly claimed. In this manner the trial court may resolve all questions at one time, rather than deciding them piecemeal. Of course, we recognize that if the witness is ordered to return to the grand jury, he may be confronted with additional questions in response to which he may desire to assert his privilege again. This he may do. Nevertheless, it is our expectation that the inquiry will be organized to avoid repeated breakaways for testing single assertions of the privilege.

## IV

The temporary writ of prohibition, as modified, is dissolved and the permanent writ is denied. The Judge of the Marion County Criminal Court, Division One, is ordered to reconsider original relators' motions to quash in light of Part II of this opinion. If the grand jury which issued additional relators' subpoenas is in session, additional relators are ordered to submit any motions to quash to the proper court immediately. If the grand jury issuing additional relators' sub-

poenas is in vacation, the prosecutor may proceed as outlined herein.

The alternative writs heretofore granted are now dissolved, and the request for a permanent writ is denied.

Givan, C.J., Arterburn, DeBruler and Prentice, JJ., concur.

NOTE.—Reported at 329 N.E.2d 573.