Danny SAINTIGNON, Appellant,

v.

STATE of Indiana, Appellee.

No. 49S00–9111–CR–941.

Supreme Court of Indiana.

June 29, 1993.

---

Ali Talib, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Sue A. Bradley, Deputy Atty. Gen., for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant for Murder; Incest, a Class D Felony; and six counts of Child Molesting, One Class A, two Class B, and three Class C felonies. He received maximum consecutive sentences for a total of 177 years.

The facts are: Between September of 1988 and January of 1990, appellant lived in Indianapolis with his girl friend, Eva McKinney. Their daughter Danielle was born April 19, 1988, and Eva's daughter, Shelia, was born March 16, 1982. Tana McKinney was born December 31, 1983, and Jeannette McKinney was born July 30, 1985. Shelia often stayed with her maternal grandmother during the week but she usually returned to her mother's home on weekends. When Shelia stayed at her mother's home, she slept in the same room with her sister Danielle, the decedent in this case.

One night in January of 1990, while the girls were in bed, appellant entered the room and removed Danielle's nightgown and diaper. He then lay on top of Danielle moving himself "up and down." As the child cried out, he covered her mouth to quiet her screams. He then forced his penis into Danielle's mouth. As he left the room, he admonished Shelia not to tell anyone about what she had seen. The baby continued to cry after appellant left, so Shelia got up and dressed the baby in her nightgown and diaper and fed her a bottle of milk.

Shelia testified that she also was a recipient of appellant's attention. She testified that on three different occasions, while she slept, appellant came into her room, pushed up her nightie, pulled down her panties, and performed sexual intercourse. He also placed his penis in her anus. On one occasion, this caused her to bleed in the bed. Tana testified that appellant repeatedly coaxed her into his bedroom and removed her clothes. He then performed sexual

intercourse with her as they lay in the bed. She testified that the intercourse was painful to her.

On January 29, 1990, Eva, the children's mother, fixed breakfast. Appellant went to work and Tana went to kindergarten. When Tana returned from school, Shelia came home with her. The family ate dinner that evening and Eva noticed that Danielle ate less than she usually did. After the meal, the defendant left to visit a friend. Eva heard appellant return at 10:30 p.m.

The next afternoon Eva went to a Girl Scout meeting and when the defendant picked her up he brought the two youngest girls with him. Eva noticed Danielle was very pale and had vomited on her coat. She whined and whimpered and threw up as they rode home. When they arrived, Eva noticed the child was listless and repeatedly asked for a drink of water. She put the baby to bed then joined her cousin for dinner. When she called home to check on the baby, the defendant told her to come home. When she arrived, she suggested they take the baby to the hospital; however, appellant told her to wait another day.

The next morning the baby appeared to be very ill. She kept asking for water but vomited everything she consumed. When Eva diapered the child, she noticed she had suffered injury to the rectal area and that her legs "looked cold and purple." She took the baby to the hospital where doctors discovered she had been dead for some time and that rigor mortis had begun to set in. The doctors observed that she had received such a severe tear to the rectum that it had allowed fecal material to penetrate the abdominal cavity and induce peritonitis. The doctors also observed that the child had sustained injuries to her rectal area previous to those which had caused her death. Authorities then examined the other girls and ascertained that they too had been molested.

During the trial, after the girls had testified, appellant's attorney filed a motion in limine that the authorities to whom the girls had spoken not be permitted to testify concerning the girls' statements to them.

The trial judge overruled the motion as to the two older girls; however, he sustained the motion as to Jeannette since she could only remember having talked to the authorities but was too young to repeat what she had told them. However, since the older girls had testified in detail as to what they told the authorities and had testified directly as to what had happened to them, the judge permitted authorities to testify concerning their statements.

Appellant claims the trial court erred in denying his motion in limine and his motion to suppress the testimony of Wilbur Atwell and Steven Sims. The judge sustained appellant's motion in limine concerning the proffered testimony of Sims to the effect that he had offered appellant a polygraph test to which the appellant replied, "Sure, I'll take the polygraph." The judge ruled that the State could not present such evidence to the jury nor could Sims make any reference to the polygraph test.

However, the judge overruled the motion in limine concerning the testimony of both Atwell and Sims as to their advising appellant of his *Miranda* rights and the statements appellant made after his rights were explained to him. It should be noted that neither witness testified that appellant had confessed the charged crimes. However, his statements to the police officers did tend to place him at the scene with knowledge and responsibility for the situation.

Appellant contends that at the time of the interrogation he was in custody as a result of an unrelated burglary charge and that he thought the interrogation was exclusively for the burglary and did not involve the death of the child. However, immediately after receiving his *Miranda* warnings he in fact was questioned concerning the death of the child. At the time of the interview, no formal charges had been made against appellant concerning the death of the child.

We have held that once the police have Mirandized a suspect, they do not have to reiterate the warnings every time they change the subject of the interrogation. *See Dickson v. State* (1988), Ind., 520 N.E.2d 101; *Moredock v. State* (1987), Ind.,

514 N.E.2d 1247. In the latter case, we stated that the advisement "need not be repeated so long as ... the suspect has not been deprived of the opportunity to make an informed and intelligent assessment of his interests involved in the interrogation, including the right to cut off questioning." *Id.* at 1249. We see nothing irregular in this procedure. There was no reversible error in this regard.

■ Appellant claims the trial court erred in allowing the State to introduce the testimony of those who had interviewed the children following the death of the baby. Although this case was tried before the decision in *Modesitt v. State* (1991), Ind., 578 N.E.2d 649, appellant argues that, notwithstanding the statement in *Modesitt* that it was to act prospectively only, the principle should be applied in this case. He further argues the State in fact did violate the holding in *Patterson v. State* (1975), 263 Ind. 55, 324 N.E.2d 482, which case was overruled by *Modesitt*. The *Patterson* rule, which in fact was in effect at the time of this trial, was discussed thoroughly by the trial judge and counsel during the hearing on the motion in limine.

The trial judge pointed out that the children already had testified not only as to their direct observations and experiences with appellant but also specifically as to what they had told the authorities whom the State was offering as witnesses. It is obvious from reading the transcript of the judge's observations and ruling on the motion in limine that he meticulously followed the ruling in *Patterson*.

We hold that the rule in *Modesitt* was not in place at the time of this trial and pursuant to specific language in that case does not operate retrospectively. The *Patterson* rule was in place and was followed meticulously by the trial court.

■ Appellant claims the evidence is insufficient to support his convictions. Although appellant concedes that this Court will not reweigh evidence, citing *Stwalley v. State* (1989), Ind., 534 N.E.2d 229, he nonetheless points out that the doctors testified it would take from one to five days for the peritonitis which had killed the child

to develop following the tearing in her rectum, and further that appellant had presented alibi witnesses to the effect that for several days prior to the child's death he had been away from the child's home. However, the evidence in this case shows that appellant was in the home at the time it was discovered the child was ill on January 29 and when the child arrived at the hospital on January 30, she was deceased.

The children who testified concerning appellant's molestations of them testified they occurred in January of 1990. The fact that appellant was away from the home the evening of January 26 to the morning of January 29 in no way excludes appellant from participation in the alleged molestation of the children. In view of the testimony of the children and the advanced condition of the deceased child's body, there is ample evidence in this record to support the verdict of the jury.

The trial court is affirmed.

SHEPARD, C.J., and DICKSON and KRAHULIK, JJ., concur.

DeBRULER, J., concurs with opinion in which DICKSON, J., concurs.

DeBRULER, Justice, concurring.

The core circumstances shown by the record, upon which the trial court ruled appellant's custodial statements to be admissible, include circumstances spanning a two day period. Appellant's daughter Danielle was pronounced dead at Methodist Hospital at about 2:00 p.m. on January 31, 1990. At that point, Appellant displayed hostility toward the suggestion that an autopsy be performed. Police were called by the emergency room doctor. Detectives then arrived and talked with appellant and the child's mother. Twelve hours later at 2:00 a.m. on February 1, 1990, the Indianapolis police responded to a report of a man trying to break into an apartment. Appellant was chased from the building, and was seen to throw a hammer to the ground. He was immediately arrested on the scene for attempted burglary and transported to the city lockup. Seventeen

hours later at 7:00 p.m. February 1, 1990, appellant was taken from his cell to an interrogation room. He was read his *Miranda* rights and signed a waiver. In the very next moment he was first told the specific subject of the questioning, namely Danielle's death. Under questioning, appellant denied involvement in the death, but agreed to take a polygraph. In pretest questioning, appellant again denied responsibility, but said he was drinking heavily near the date of death and "anything was possible when—when he was drinking." This statement was permitted in evidence over appropriate objection.

Appellant makes a Fifth Amendment claim of inadmissibility, arguing that his waiver of the privilege against self-incrimination and the right to counsel was not shown by the prosecution to be knowing, intelligent and voluntary as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The gravamen of the claim is that the interrogator did not tell him the specific purpose of the interrogation, i.e., to get incriminating evidence of the cause of the child's death. Generally, where the advisements are given in conformity with the *Miranda* dictates, and the suspect is aware that the interrogator intends to use any statements to procure a conviction, the subsequent waiver is valid. *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135; 89 L.Ed.2d 410 (1986). *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). However, here there is more than a complete set of advisements. Appellant's knowledge of the trauma to the child's body, the tragic death of the child itself, and the events at the hospital, provided him with notice that a serious inquiry into the cause of her death was in the offing. Accordingly, I agree that upon this record, a rational trier of fact could conclude beyond a reasonable doubt that the waiver was valid by Fifth Amendment standards despite the lack of a warning of the crime under investigation. There is no cause here to consider whether such an additional warning is required under state law. *Cf. In Re Caito* (1984), Ind., 459 N.E.2d 1179; *State ex rel Pollard v. Criminal Court of*

*Marion County* (1975), 263 Ind. 236, 329 N.E.2d 573; *State v. Fields* (1988), Ind. App., 527 N.E.2d 218.

DICKSON, J., concurs.